## <u>AFFIDAVIT OF EDWARD GALLIVAN</u>

I, Edward Gallivan, Task Force Officer with the U.S. Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## I.    <u>INTRODUCTION</u>

1.      I am a Detective with the Ipswich Police Department and have been assigned as a Task Force Officer ("TFO") with the DEA since April 2012.  I am currently assigned to the DEA's New England Field Division's Boston Office.  I am a graduate of the Massachusetts Criminal Justice Training Council Police Academy and have been a full-time Police Officer since July 2006.  I was previously employed as a part-time Police Officer from 2002 to 2006.   I was assigned as Detective in October 2009, and I was sworn in as a Deputy Sheriff in Essex County in October 2012.

2.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code, and I am a government agent duly authorized by the Attorney General to request a search warrant under Federal Rule of Criminal Procedure 41.  In furtherance of my past and current assignments in law enforcement, I have received specialized training regarding narcotics investigations, including such training sponsored by the DEA, The United States Office of Drug Control Policy High Intensity Drug Trafficking Area, The El Paso Intelligence Agency, the Massachusetts State Police, The New England State Police Intelligence Network, the Massachusetts Municipal Police Training Committee, and the Boston Police Department.  During the course of my career with the Ipswich Police Department, I have participated in over 100 drug-related investigations that have resulted in state convictions of at least 50 individuals.  As a TFO, I have participated in

approximately 25 federal drug-related investigations that have resulted in numerous drug seizures and arrests.

3.      I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base, heroin, marijuana, MDMA, and other controlled substances that are, by themselves, illegal to possess.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in their trade.

4.      I have participated in various aspects of drug-related investigations, including but not limited to: conducting surveillance, debriefing informants, interviewing suspects, acting in an undercover capacity, and supervising controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have also prepared numerous affidavits submitted in Massachusetts courts – both state and federal – in support of applications for criminal complaints, search warrants, tracking warrants, and/or arrest warrants.

5.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.  I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to

as "stash houses."  I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, pager messages, and other means of communication to facilitate their illegal activities.

## II.   PURPOSE OF THE AFFIDAVIT

6.    The requested search warrants discussed below are sought in furtherance of an investigation into the criminal activity of (1) Jorge DELGADO a/k/a Elisaul Martinez Santana a/k/a Antonio Martinez and (2) Juanel PENA (collectively, the "Target Subjects").   The investigation concerns violations of 21 U.S.C. § 841(a)(1) (distribution of controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances).

7.    I submit this affidavit in support of applications for warrants to search electronic equipment, specifically the three cellular telephones listed in Attachments A1-A3 (that are presently in the possession of law enforcement investigators), and to seize evidence as set forth in Attachment B, all of which are attached hereto and incorporated herein by reference.   The three cellular telephones are as follows:

a.   a black Apple I-Phone cellular telephone, bearing IMEI 99000288183541 and FCC ID BCG-E2599A IC 579C-E2610A ("Target Telephone #1), seized from DELGADO on October 3, 2014 (as discussed in ¶ 8 below), and described in greater detail in Attachment A-1;

b.   a black Samsung cellular telephone, model SPH-M270 bearing DEC 268 435 462 915 587 419 (Target Telephone #2), seized from DELGADO on October 3, 2014 (as discussed in ¶ 8 below), and described in greater detail in Attachment A-2;

    c.  a black Apple I-Phone cellular telephone, bearing EMC 2422 and FCC ID BCG-E2422B (Target Telephone #3), seized from PENA on October 2, 2014 (as discussed in ¶ 8 below), and described in greater detail in Attachment A-3;

8.    The three cellular telephones described above are collectively referred to as the "Target Telephones."  Target Telephones #1 and #2 were seized from DELGADO upon his arrest on October 3, 2014.[1]  Target Telephone #3 was seized from PENA upon his arrest on October 2, 2014.  Both DELGADO and PENA were arrested in connection with the investigation described herein, and both have been charged with conspiracy to distribute heroin and fentanyl (in violation of 21 U.S.C. § 846) and distribution of heroin (in violation of 21 U.S.C. § 841(a)(1)) in criminal case number 14-10285-FDS, which remains pending.[2]

9.    Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized set forth in Attachment B (incorporated herein) will be found in the items to be searched as described in Attachments A1-A3 (incorporated herein).  These items may be or lead to: (1) evidence of the existence of drug trafficking in violation of Title 21, United States Code Sections 846 and 841(a)(1); (2) contraband, fruits of crime, or things otherwise criminally possessed; and (3) property designed or intended for use, or which is or has been used, as a means of committing criminal offenses.

---

[1]    On October 3, 2014, shortly after Target Telephones #1 and #2 were seized from DELGADO upon his arrest, an agent called phone number 978-210-6569, which was known to be used by DELGADO (as discussed in ¶¶ 29-34 below).  Once the agent called that phone number, Target Telephone #2 indicated it was receiving an incoming call from the agent's phone.  This confirmed that Target Telephone #2 is assigned phone number 978-210-6569, *i.e.*, the number assigned to "DELGADO's 6569 Phone" discussed below.

[2]    A third defendant, THOMAS MARTINEZ-ORTIZ, was also charged with these offenses in criminal case number 14-10285-FDS.  MARTINEZ-ORTIZ has already pled guilty and been sentenced in this matter.

10. I have participated in the below-described investigation since April 2014. I am familiar with the facts and circumstances of this investigation based on my personal participation in the investigation and information I have received from a variety of sources, including other law enforcement officers and agents, as well as a cooperating witness. Because this affidavit is being submitted for the limited purpose of securing the above-described search warrants concerning the Target Telephones, I have not included details of every aspect of the investigation, nor have I set forth each and every fact learned during the course of this investigation. I have included facts and circumstances that I believe are more than sufficient to supply probable cause in support of the issuance of such search warrants. Facts not set forth herein are not being relied on in reaching my conclusion that there is more than sufficient evidence to support the issuance of the requested search warrants. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## III.   BACKGROUND OF THE INVESTIGATION

11. On April 8, 2014, the Salem PD located the body of a deceased ▮▮▮▮▮▮▮▮, who was found dead on the floor of his apartment with a used hypodermic needle in his right hand. In close proximity to his body, detectives found a small plastic baggy containing traces of a brownish powder suspected to be heroin and/or fentanyl.[3] Based on these observations and others, as well as information obtained that ▮▮▮▮▮▮ had a history of drug abuse, the Salem PD determined that ▮▮▮▮▮ died of a drug overdose, as confirmed by the findings of the Massachusetts Office of Chief Medical Examiner. ▮▮▮▮▮ s death certificate reflects that he died from "acute intoxication due to the combined effects of fentanyl and opiates (heroin)."

---

[3] Test results issued by the DEA Northeast Laboratory in July 2014 confirmed that the plastic baggy contained approximately 0.27 grams of heroin combined with fentanyl.

12.     In April 2014, in connection with ⬛⬛⬛'s death, the Salem PD informed the DEA that at least five other drug-overdose deaths had occurred in Salem, Massachusetts, over a short time period between February 2014 and April 2014.  The Salem PD also provided the DEA with information supporting the Salem PD's belief that a drug-trafficking organization operating in Salem and Peabody, Massachusetts, led by Jorge DELGADO ("DELGADO DTO"), was responsible for distributing at least some of the narcotics, suspected of containing fentanyl, that have led to the recent rash of drug overdoses in Salem.  Upon receiving this information, the DEA commenced a joint DEA-Salem PD investigation into the DELGADO DTO.

13.     At the outset of this joint investigation, the DEA analyzed phone activity records pertaining to ⬛⬛⬛'s cell phone number, which revealed that ⬛⬛⬛'s cell phone number was in contact on multiple occasions with phone number 781-513-9963, which was frequently used by DELGAGO and his female companion and criminal associate, Carlenis ORTIZ, in April and May 2014 ("DELGADO's 9963 Phone"), as discussed below.  These phone records further revealed that ⬛⬛⬛s phone number was in contact with DELGADO's 9963 Phone just two days before ⬛⬛⬛ was found dead.  The DEA's investigation has confirmed that the DELGADO DTO has distributed heroin and sometimes fentanyl—in place of heroin—to its heroin customers.

14.     As further discussed below, from May 2014 through July 2014, the DEA coordinated numerous controlled purchases (as well as one undercover purchase) of narcotics from the DELGADO DTO.  These controlled and undercover purchases have revealed that the DELGADO DTO operates as follows: (1) the DTO's narcotics customers call cellular phones

used by DELGADO and ORTIZ,[4] who then direct the customers to go to certain locations in and

around Salem to purchase the narcotics; and (2) while DELGADO and ORTIZ occasionally meet

with customers to consummate the narcotics transactions, DELGADO normally uses runners to

meet with the customers at said locations to consummate the transactions.

## IV.    FACTS ESTABLISHING PROBABLE CAUSE

### A.    Cooperating Witness Information

15.    In late April 2014, a cooperating witness (the "CW") working with the Salem PD

provided information to the DEA regarding the DELGADO DTO.  The CW began cooperating

with law enforcement in this investigation in efforts to reduce his/her criminal liability in

connection with a state drug charge that was pending at that time.[5]  The CW reported that

(among other things): (i) DELGADO has been involved in the distribution of heroin and cocaine

in the Salem and Peabody areas of Massachusetts since at least 2012[6]; (ii) DELGADO's

customers call his cell phone to place drug orders, and then one of his runners delivers gram

quantities of heroin or cocaine (packaged in small plastic baggies) to customers at specific meet

---

[4]    The investigation has revealed that ORTIZ often serves as DELGADO's English-Spanish interpreter when English-speaking customers call DELGADO's phone to purchase narcotics.

[5]    Due at least in part to the CW's cooperation, that state charge was dismissed in August 2014.  The CW's criminal history includes the following state matters: (i) a March 2014 CWOF to a drug possession charge; (ii) a November 2013 conviction for resisting arrest; (iii) August 2013 CWOFs to various charges, including breaking and entering, malicious destruction of property, resisting arrest, and operating after suspended license; (iv) a February 2010 CWOF to an operating after suspended license charge; (v) July 2009 CWOFs to various charges, including ABDW, assault and battery, trespassing, and disorderly conduct; (vi) a February 2007 (juvenile) CWOF to a disorderly person charge; and (vii) August 2006 (juvenile) CWOFs to various charges, including assault, disorderly person, operation of a vehicle without authority, and negligent operation of a vehicle.  The CW has also received payment from the DEA in connection with his/her cooperation, in this case.

[6]    The CW later clarified that while the DTO had supplied him/her with narcotics since at least early 2012, DELGADO was not involved in the DTO until at least early 2013.

locations, including such a location at the rear of a yellow house located at 56 Salem Street, Salem, Massachusetts ("56 Salem Street"); (iii) DELGADO often delivers larger orders himself to a meet location in Peabody; (iv) DELGADO, who frequently changes his drug order phone number, was using phone number 781-513-9963 (DELGADO's 9963 Phone) at that time as his drug order number; and (v) DELGADO or his Hispanic female associate (who was unknown at that time but has since been identified as ORTIZ) would answer his drug order number and direct customers to go to a specific location to obtain the drugs.  The CW reported that his/her information was based on his/her own history of purchasing drugs from DELGADO and his associates.  The CW's information has been proven to be reliable and accurate through the course of this investigation, as discussed further below.

16.     Beginning in early May 2014 through July 2014, the DEA coordinated approximately 11 controlled purchases of narcotics from the DELGADO DTO with the cooperation of the CW.  In addition, the DEA coordinated an undercover purchase of narcotics from the DELGADO DTO during that time period.  Summarized below are a few examples of these narcotics purchases.

### B.     Controlled and Undercover Purchases

*May 2, 2014 Controlled Purchase of Fentanyl*

17.     On May 2, 2014, at approximately 4:40 p.m., the CW (under the supervision of the DEA) placed a consensually-recorded call to DELGADO's 9963 Phone, which was answered that day by an unknown Spanish-speaking female later identified as ORTIZ.  During this call, the CW requested "five brown," and ORTIZ stated that she would call the CW back.  Shortly thereafter, the CW received an incoming call from DELGADO's 9963 Phone.  During this call, ORTIZ told the CW to go to the "yellow house on Salem Street" (known to the CW and agents

as 56 Salem Street), and the CW said he/she would be there in "a few minutes."  At about 4:50 p.m., the CW and the undercover agent ("UCA") drove from the law enforcement team's usual pre-transaction meeting location ("predetermined location") towards the vicinity of 56 Salem Street.

18.     A few minutes later, the CW and the UCA arrived at said location, where the UCA soon observed one of DELGADO's runners, Juanel PENA, walk down Salem Street.  The CW then exited the UCA's vehicle and proceeded to the rear area of 56 Salem Street, and PENA then proceeded to the same area.  PENA then delivered five plastic baggies of brownish powder to the CW in exchange for $150 of official agency funds.  Approximately one minute after PENA arrived at the scene to deliver the drugs, the UCA observed both PENA and the CW reappear at the front of 56 Salem Street.  The UCA then observed PENA walk towards Palmer Street, while the CW entered the UCA's vehicle.  After the CW provided the UCA with the five baggies, the CW and UCA drove back to the predetermined location. As part of this controlled purchase, the CW was searched before and after the drug transaction to confirm he/she had no contraband on his/her person (other than the drugs obtained via the controlled purchase).  Test results from the DEA Northeast Laboratory show that the five baggies sold to the CW that day contained approximately 1.2 grams of fentanyl.

        *May 9, 2014 Controlled Purchase of Fentanyl*

19.     On May 9, 2014, at approximately 2:00 p.m., the CW (under the supervision of the DEA) placed a consensually-recorded call to DELGADO's 9963 Phone to buy heroin. During this call, the CW requested "ten," and DELGADO told the CW to "go to 48 Ward Street."   At approximately 2:25 p.m., the CW and the UCA drove from the predetermined

location towards the vicinity of 48 Ward Street, Salem, MA ("48 Ward Street"), which is a location where the CW had met with DELGADO's runners to obtain drugs on prior occasions.

20.     A few minutes later, the CW and the UCA arrived at said location, where the CW then exited the UCA's vehicle and proceeded up the stairs along the side of 48 Ward Street.  The UCA then observed PENA and an unidentified male (later identified as Juan Minaya) walking down Ward Street.  PENA and Minaya then stood at a passageway just beyond 48 Ward Street, where PENA appeared to be using his phone.  Shortly thereafter, following PENA's and Minaya's brief interaction with an unidentified driver of a Nissan Altima and two other unidentified males, PENA proceeded up the stairs along the side of 48 Ward Street, where he then delivered ten plastic baggies of brownish powder to the CW in exchange for $300 of official agency funds.  About one minute after PENA proceeded up the stairs along the side of 48 Ward Street, the UCA observed both PENA and the CW descend the stairs.  The CW entered the UCA's vehicle and provided the UCA with the ten baggies, and they drove back to the predetermined location.  Consistent with prior controlled purchases, the CW was searched by a female agent before and after the drug transaction to confirm she had no contraband on her person (other than the drugs obtained via the controlled purchase).  Test results from the DEA Northeast Laboratory show that the ten baggies sold to the CW that day contained approximately 2.0 grams of fentanyl.

### May 21, 2014 Controlled Purchase of Heroin

21.     On May 21, 2014, at approximately 2:10 p.m., the CW (under the supervision of the DEA) placed a consensually-recorded call to DELGADO's 9963 Phone to buy heroin. During this call, the CW requested "nine," and DELGADO told the CW to go to "Salem."  The agents then activated an audio recorder and an audio-video recorder on the CW.  A few minutes

later, the CW called DELGADO's 9963 Phone, and DELGADO told the CW to go to "the yellow house."  At about 2:19 p.m., the CW and the UCA drove from the predetermined location towards the vicinity of 56 Salem Street.

22.     A few minutes later, the CW and the UCA arrived at said location.  The CW then called DELGADO's 9963 Phone again, and DELGADO stated: "You there?"  The CW responded: "Yeah, I'm here."  DELGADO then stated: "One minute."  The CW then exited the UCA's vehicle and proceeded to the rear area of 56 Salem Street (via the walkway on the right side of house).  A few minutes later, agents observed PENA approach the area on a bicycle and park his bicycle across the street from 56 Salem Street.  PENA then crossed the street and proceeded to the rear area of 56 Salem Street (via the walkway on the right side of house), where PENA delivered nine plastic baggies of brownish powder to the CW in exchange for $270 of official agency funds.  The audio recording captures some of the quiet exchange, including PENA distinctly telling the CW to "put it in your mouth," in other words, to put the plastic baggies in the CW's mouth so that they would be hidden from law enforcement.  The recording also captures both PENA and the CW stating "nueve" which means "nine" in Spanish.  About one minute after PENA proceeded to the rear of the house, the UCA observed PENA reappear at the front of the house.  The UCA then called him over to her vehicle.  PENA walked towards the vehicle, and the UCA and PENA had a face-to-face conversation.  The UCA asked PENA if she (the UCA) could call him.  PENA said something in Spanish (which the UCA did not understand).  Seconds later, the CW walked towards the vehicle and asked PENA while he was departing the scene: "You talking to my friend?"

23.     Call detail records reveal that DELGADO's 9963 Phone contacted phone number 339-440-3469, believed to be used by PENA ("PENA's Phone"),[7] immediately before the transaction (at 2:11 p.m. and again 2:20 p.m.), as well as later that same afternoon (at 3:45 p.m.).

24.     The CW then entered the UCA's vehicle, provided the UCA with the nine baggies, and they drove back to the predetermined location.  Consistent with prior controlled purchases, the CW was searched by a female agent before and after the drug transaction to confirm she had no contraband on her person (other than the drugs obtained via the controlled purchase).  Test results from the DEA Northeast Laboratory show that the nine baggies sold to the CW that day contained approximately 2.5 grams of heroin.

*May 30, 2014 Undercover Purchase of Heroin*

25.     On May 30, 2014, at approximately 1:19 p.m., the UCA placed a consensually-recorded call to DELGADO's 9963 Phone to buy heroin.  After DELGADO answered the call, ORTIZ spoke with the UCA.  The CW requested "six," and ORTIZ (who is heard intermittently speaking Spanish as a translator for DELGADO) told the UCA to go to "Ward Street" (in reference to 48 Ward Street, Salem, Massachusetts, where the CW had met with DELGADO's runners to obtain drugs on many prior occasions).  At approximately 1:30 p.m., the UCA and a fellow agent (also in undercover capacity) drove from the predetermined location towards the vicinity of 48 Ward Street, Salem, Massachusetts ("48 Ward Street").

26.     A few minutes later, the UCA and fellow agent arrived at said location, where the UCA exited the vehicle and ascended the stairs along the side of 48 Ward Street.  Once atop the

---

[7]     Agents believe that PENA is the user of this phone number, given that: (1) this phone number is listed as "Wanel" (PENA's first name is Juanel) in MARTINEZ-ORTIZ's cell phone, as discussed below; and (2) call detail records reveal that DELGADO's 9963 Phone was in contact with PENA's Phone multiple times on the days of the other controlled buys involving PENA, including contacts between those phones immediately before and soon after the time of the transaction on nearly all of those days.

stairs, the UCA made an unrecorded call to DELGADO's 9963 Phone to inform DELGADO that she had arrived.  DELGADO told her "ten minutes."  About ten minutes later, the UCA received an incoming call (unrecorded) from DELGADO's 9963 Phone.  ORTIZ asked what type of car the UCA was driving, and the UCA responded "a black Jeep Cherokee."  ORTIZ then stated: "Oh, okay I see it."  About one minute later, agents observed DELGADO and ORTIZ walk down Ward Street.  They then observed DELGADO make a head gesture towards the UCA's location, indicating that the UCA should follow DELGADO and ORTIZ.  The UCA then descended the stairs and followed them into a narrow passageway between 50 Ward Street and 52 Ward Street and then up a stairway behind 52 Ward Street.

27.     At the outset of the UCA's meeting with DELGADO and ORTIZ, DELGADO asked the UCA in broken English: "how you do it?" The UCA understood this question to be DELGADO's way of asking how the UCA used heroin.  The UCA responded: "sniff." DELGADO then pulled out a plastic bag half full of smaller baggies of brownish powder (consistent with those purchased from the DELGADO DTO during past controlled purchases). DELGADO removed the contents of one of the baggies and told the UCA, "do it," while trying to pour the powder into the UCA's hand.  As the UCA backed away, ORTIZ explained that DELGADO was acting in this manner because he had never dealt with the UCA before.  The UCA then heard sounds from behind, which she used as an excuse to say someone was coming. The UCA handed DELGADO the $180 in official agency funds, and DELGADO then handed the UCA the agreed-upon six baggies, as well as the one he had opened, saying "free."

28.     At approximately 1:54 p.m., agents observed the UCA exit the narrow passageway and reappear on Ward Street.  The UCA entered the black Jeep Cherokee and departed the area with her fellow agent.  Test results from the DEA Northeast Laboratory show

that the six baggies sold to the UCA that day contained approximately 1.2 grams of heroin.  The contents of the open seventh baggy field-tested positively for narcotics but were not sent to the DEA Northeast Laboratory.

### June 13, 2014 Controlled Purchase of Heroin

29.     On June 13, 2014, at approximately 1:48 p.m., the CW (under the supervision of the DEA) placed a consensually-recorded call to phone number 978-210-6569, used by DELGADO and ORTIZ ("DELGADO's 6569 Phone"),[8] to buy heroin.   During this call, the CW requested "15 brown," and DELGADO told the CW to go to "Salem."   At approximately 2:02 p.m., the CW placed another consensually-recorded call to DELGADO's 6569 Phone. During this call, the CW initially spoke with DELGADO and then spoke with ORTIZ (who is heard intermittently speaking Spanish with DELGADO).  ORTIZ confirmed that the CW wanted "15" and told the CW to go to "Salem."  Shortly thereafter, the CW received an incoming call from DELGADO's 6569 Phone.  During this consensually-recorded call, DELGADO told the CW to go to the "yellow house."  At approximately 2:10 p.m., the CW and the UCA drove from the predetermined location towards the vicinity of 56 Salem Street.

30.     The CW and the UCA arrived at said location about ten minutes later.  The CW then exited the UCA's vehicle and proceeded to the rear area of 56 Salem Street.  Several minutes later, the UCA observed one of DELGADO's runners, later identified as Thomas MARTINEZ-ORTIZ (discussed in footnote 1 above), walk down Salem Street proceed to the

---

[8]     In early June 2014, the CW reported to agents that the DELGADO DTO was using DELGADO's 6569 Phone as its new drug order telephone instead of DELGADO's 9963 Phone.  According to the CW, this development was consistent with DELGADO's practice of changing his drug order phone number on a regular basis.   Phone records indicate that DELGADO's 6569 Phone was activated on June 4, 2014, and controlled purchases conducted on June 13, 2014 and July 9, 2014 have confirmed that this phone was the DELGADO DTO's new drug order telephone at that time.

rear area of 56 Salem Street.  MARTINEZ-ORTIZ then provided the CW with 14 (instead of 15) plastic baggies of brownish powder to the CW in exchange for $450 of official agency funds.

31.     After the transaction, the CW walked to the UCA's vehicle, where the CW realized he/she had 14 baggies instead of 15, and the CW returned to the rear area of the house to obtain the 15th baggie that MARTINEZ-ORTIZ had mistakenly not given him/her.  The CW then returned to the UCA's vehicle, provided the UCA with the 15 baggies, and they drove back to the predetermined location.  As part of this controlled purchase, the CW was searched before and after the drug transaction to confirm he/she had no contraband on his/her person (other than the drugs obtained via the controlled purchase).  Test results from the DEA Northeast Laboratory show that the 15 baggies sold to the CW that day contained approximately 3.5 grams of heroin.

#### C.     Other Relevant Information

32.     On June 17, 2014, the Salem PD responded to reports of a street brawl in the area of 26 Park Street in Salem, Massachusetts.  Officers arrested MARTINEZ-ORTIZ for assault and battery and disorderly conduct.   While searching MARTINEZ-ORTIZ upon arrest, officers found him to be in possession of 46 plastic baggies of suspected heroin (consistent with the baggies sold by the DELGADO DTO through the course of this investigation) and 17 plastic baggies of suspected cocaine.  Officers seized these baggies as well as a cell phone belonging to MARTINEZ-ORTIZ assigned phone number 978-530-7225 ("MARTINEZ-ORTIZ's 7225 Phone").

33.     Test results from the DEA Northeast Laboratory show that the 46 baggies contained a total of approximately 9.9 grams of heroin, and the 17 baggies contained a total of approximately 7.8 grams of cocaine.

34.     MARTINEZ-ORTIZ's 7225 Phone was searched pursuant to a state search warrant.  His cell phone data reveals numerous contacts with DELGADO's 9963 Phone and DELGADO's 6569 Phone throughout June 2014, including 10 contacts with DELGADO's 6569 Phone on the date of MARTINEZ-ORTIZ's arrest.  Notably, DELGADO's 9963 Phone is listed in MARTINEZ-ORTIZ's 7225 Phone as "El prim," and DELGADO's 6569 Phone is listed therein as "El Prim 2."   Further, the cell phone data reveals numerous contacts throughout June 2014 with a contact listed as "Wanel," who is believed to be Juanel PENA.

35.     I have participated in numerous investigations of people who distribute illegal narcotics.  Based upon my knowledge, training, and experience, I know that:

     a.   Drug traffickers will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, social networking sites, and voice messages.

     b.   Drug traffickers typically carry and use multiple cellular telephones at any one time and will frequently change cell phones and cell phone numbers in an attempt to avoid detection by law enforcement.

     c.   Drug traffickers typically use cell phones to communicate with each other about their drug trafficking activities including but not limited to obtaining drugs, arranging for the sale of drugs, arranging for the collection and disposition of the financial proceeds from drug sales, and coordinating their illicit activities with co-conspirators.

36.     Based upon my training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones including "smart phones" now offer a broad range of capabilities and many

smartphones can now function essentially as small computers. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; sending, receiving, and storing instant messages, accessing and communicating over social networking websites like Facebook, taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device. Based on my training, experience, and research, I know that the Target Telephones have at least some of the capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.

37. I believe there is probable cause to believe that each of the phones described in Attachments A1-A3, contain evidence of the drug trafficking activities of DEGLADO, PENA, ORTIZ, and others, to include the items spelled out in Attachment B. First, each of the phones was seized from individuals (DELGADO, PENA) associated with the trafficking operation. Second, as noted herein, the set-up of the heroin and fentanyl distribution operation required communication and coordination that would seemingly compel the participants to use their cell phones in furtherance of the offense. Third, during the investigation, DELGADO used cellphones to speak with the CW and the UCA regarding drug deals, and agents observed PENA using a cellular telephone. Finally, I have participated in numerous investigations of people who distribute illegal narcotics. Based on my training and experience and investigation in this case, I know it is common for drug traffickers to have more than one cellular telephone and to use

multiple cellular telephones to further their drug trafficking activity.   Based on my training, experience, and the investigation in this case, I believe that there is probable cause to believe that each of the Target Telephones contains evidence relating to drug trafficking.

38.     Each of the Target Telephones described in Attachments A1-A3 are currently in the lawful possession of the DEA and have been since they were seized on October 2 and 3, 2014.   Each of the Target Telephones is currently in storage in the DEA Non-Drug Evidence Vault at the DEA Boston Office.   In my training and experience, I know that each of the Target Telephones has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of the DEA.

## V.     ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet.   This is true because:

a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.   Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.   Even after files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.   In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.   Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.   This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging

files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

40.   As described above and in Attachment B, this application seeks permission to search and seize things that the Target Telephones might contain in relation to drug trafficking, in whatever form they are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Searching for the evidence described in Attachment B may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communication to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment B, or perusing all stored information briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, various data analysis techniques may be necessary to locate and retrieve the evidence described in Attachment B.

41.    For all the foregoing reasons, I respectfully request that this Court issue the requested search warrants authorizing the searches of the Target Telephones.

42.    I, Edward Gallivan, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Edward Gallivan
Task Force Officer, DEA


Sworn and subscribed to before me this 11th day of August 2015, at Boston, Massachusetts

The Honorable Donald L. Cabell
United States Magistrate Judge
District of Massachusetts



**ATTACHMENT A-1**

A black Apple I-Phone cellular telephone, bearing IMEI 99000288183541 and FCC ID BCG-E2599A IC 579C-E2610A, seized from JORGE DELGADO on October 3, 2014, and assigned by DEA as Exhibit N-67 (Target Telephone #1) presently in the custody of the DEA in the DEA Non-Drug Evidence Vault at the DEA Boston Office.

**ATTACHMENT A-2**

A black Samsung cellular telephone, model SPH-M270 bearing DEC 268 435 462 915 587 419, seized from JORGE DELGADO on October 3, 2014, and assigned by DEA as Exhibit N-68 (Target Telephone #2) presently in the custody of the DEA in the DEA Non-Drug Evidence Vault at the DEA Boston Office.

**ATTACHMENT A-3**

A  black  Apple  I-Phone  cellular  telephone,  bearing  EMC  2422  and  FCC  ID  BCG-E2422B, seized from JUANEL PENA on October 2, 2014, and assigned by DEA as Exhibit N-76 (Target Telephone #3) presently in the custody of the DEA in the DEA Non-Drug Evidence Vault at the DEA Boston Office.

## ATTACHMENT B

Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) or 846, including, without limitation, all records in whatever form relating to:

1. Call logs;

2. Address books, contact names and phone numbers and lists of customers, suppliers, and related identifying information;

3. Text messages, SMS messages, email messages, social networking messages, and other electronic messages among drug associates;

4. Text messages, SMS messages, email messages, social networking messages, and other electronic messages concerning the transportation, ordering, sale and distribution of controlled substances;

5. Text messages, SMS messages, email messages, social networking messages, and other electronic messages concerning the proceeds of drug sales and records of drug trafficking including records regarding payment, payment methods, or other monetary transactions relating to drug trafficking;

6. Evidence of user attribution showing who used or owned the cellular telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, and documents;

7. Photographs, videos, and audio files concerning controlled substances, proceeds from the sales of controlled substances, the identities of coconspirators, and identifying the user or owner of the cellular telephone; and

8.   Stored geo-location information tending to identify travel to or presence at locations involved in the trafficking of controlled substances such as stash houses, load houses, or delivery points.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.